## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:12CR00044 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **WILLIAM "BILL" F. ADAMS, JR.,** | ) | By: James P. Jones |
| **ET AL.,** | ) | United States District Judge |
| | ) | |
| Defendants. | ) | |

*Randy Ramseyer, Assistant United States Attorney, Abingdon, Virginia, for United States; Michael J. Del Giudice and Timothy J. LaFon, Ciccarello, Del Giudice & LaFon, Charleston, West Virginia, and Wayne D. Inge, Roanoke, Virginia, for Defendant William "Bill" F. Adams, Jr.; Michael A. Bragg, Abingdon, Virginia, for Defendant John B. Ward.*

In this criminal case, I consider and deny post-verdict motions by the defendants.

### I.

William "Bill" F. Adams and John B. Ward were convicted by a jury in a joint trial in this court of conspiring to commit tax fraud and illegal structuring of currency transactions. They were also convicted of multiple counts of structuring.

The government contended that these crimes arose out of a so-called "ten-percent check cashing scheme." The scheme, the purpose of which was to avoid payment of taxes, involved coal mining companies and mine supply businesses located in Virginia and West Virginia. Over a period of time, the government

alleged, crooked mine suppliers provided false invoices to certain mining companies. A mining company involved in the scheme would pay the invoice to the mine supply company by check and in return the supply company would pay ninety percent of the amount of the check in cash to the mining company, keeping ten percent as its fee. The equipment and supplies on the fraudulent invoices sometimes reflected items that the mining company already owned so that the invoices might appear legitimate if audited. The invoices also sometimes reflected a mix of actual equipment and supplies provided as well as purchased cash.

This scheme allowed the mining companies and their owners to avoid payment of income tax on the cash received as well as receive fictitious business tax deductions. In addition, some of the mining companies used the cash to pay employees "off the books," so that the companies did not pay the required employment taxes and the employees in turn escaped reporting of their wages to the IRS.

The government alleged that the chief cash providers in this scheme were J.D. and C.E. McReynolds, the owners of JD&C Mine Supply Inc., E&J Mine Supply Inc., and L&A Trucking, and Kermit Wiley, the owner of United Hydraulics, Inc. The government contended that these individuals structured cash out of financial institutions by making multiple withdrawals of $10,000 or less in

order to obtain sufficient cash to support the scheme while evading the currency

transaction reporting requirements.

Numerous individuals were involved in this scheme, and many were

charged. Most pleaded guilty and several testified for the government at trial.

Four defendants, all coal operators, pleaded not guilty and were tried together.

Adams and Ward were convicted, but two codefendants, David Cline and his son

Joshua Cline, were acquitted by the jury.

Count One of the Third Superseding Indictment charged the defendants with

the following conspiracy:

> From on or about January 1, 2007, through in or about February 2012,
> in the Western District of Virginia and the Southern District of West
> Virginia, [the defendants] conspired together and with others to (a)
> defraud the United States by impeding, impairing, obstructing and
> defeating the lawful functions of the [IRS] in the ascertainment,
> computation, assessment, and collection of taxes; and (b) structure
> currency transactions with one or more domestic financial institutions
> for the purpose of evading reporting requirements, in violation of 31
> U.S.C. § 5324(a)(3).
>
> . . . .
>
> All in violation of Title 18, United States Code, Section 371.

(Third Superseding Indictment 1, 7, ECF No. 243.) Additionally, the defendants

were charged with numerous counts of structuring. These counts each charged that

the defendants "willfully caused and aided, abetted, induced and procured the

structuring and attempted structuring of currency transactions with one or more

domestic financial institutions in the Western District of Virginia and elsewhere for the purpose of evading the reporting requirements prescribed by law," in violation of 18 U.S.C. § 2 and 31 U.S.C. § 5324(a)(3). (*Id.* at 8-61.) Each count listed certain dates on which the cash providers withdrew money from financial institutions in such a way as to evade reporting requirements, and the dates on which the defendants wrote checks to the cash providers in amounts that corresponded to the cash withdrawals. These counts also charged that the structuring activity was part of a pattern of illegal activity involving more than $100,000 in a twelve-month period, conduct leading to an enhanced statutory penalty. *See* 31 U.S.C. § 5324(d)(2).

The trial lasted twelve days, from January 21, 2014, to February 5, 2014. The government called twenty-one witnesses. It presented testimony from bookkeepers, cash providers, and other coal mine operators who testified to the defendants' participation in the conspiracy and the structuring. The government also presented financial records related to the structuring charges that were verified by the records' custodians. Defendants Adams, David Cline, and Joshua Cline also called witnesses in their defense. David Cline was the only defendant who testified.

David Cline and Joshua Cline were acquitted by the jury of all charges against them. The jury found Adams guilty of the conspiracy charged in Count

One, and on thirteen counts of structuring that were part of a pattern of illegal activity involving more than $100,000 in a twelve-month period (Counts Thirty-Two, Thirty-Three, Thirty-Five, Thirty-Six, Forty, Forty-One, Forty-Two, Forty-Three, Forty-Four, Forty-Five, Forty-Six, Forty-Seven, and Forty-Eight). The jury found Adams not guilty of two structuring counts (Counts Thirty-Seven, Thirty-Nine).

The jury found Ward guilty of the conspiracy charged in Count One, on twenty-three counts of structuring that were part of a pattern of illegal activity involving more than $100,000 in a twelve-month period (Counts Six, Eight, Ten, Twelve, Fourteen, Fifteen, Sixteen, Seventeen, Nineteen, Twenty-One, Thirty-Two, Thirty-Three, Thirty-Five, Thirty-Six, Forty, Forty-One, Forty-Two, Forty-Three, Forty-Four, Forty-Five, Forty-Six, Forty-Seven, and Forty-Eight), and on one count of structuring that was not a part of a pattern of illegal activity involving more than $100,000 in a twelve-month period (Count Four). The jury found Ward not guilty of seven structuring counts (Counts Three, Seven, Thirteen, Eighteen, Twenty-Two, Thirty-Seven, and Thirty-Nine).

Adams and Ward have filed timely motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), and for new trials pursuant to Federal Rule of Criminal Procedure 33(a).

In support of his Motion for Acquittal and Motion for a New Trial (ECF Nos. 430 and 431), Adams claims that the government did not prove a single conspiracy, but actually showed three separate conspiracies: (1) a check cashing conspiracy run by J.D. McReynolds, (2) a check cashing conspiracy run by Kermit Wiley, and (3) a conspiracy to pay cash wages.  (Mem. Supp. 3, ECF No. 432.)  He argues that the government did not prove a connection between J.D. McReynolds and Kermit Wiley.  (*Id.* at 12.)  Adams also contends that the government improperly argued that the jury was only required to find either conspiracy to obstruct the IRS or conspiracy to structure currency transactions.  He argues that the jury was required to find both.  (*Id.* at 8.)  Next, Adams contends that there was insufficient evidence to link him to the conspiracy because J.D. and C.E. McReynolds did not testify that they had done business with him.  (*Id.* at 9-10.) Adams argues that the government presented improper Rule 404(b) evidence of multiple conspiracies in an effort to show his propensity toward the crime.  (*Id.* at 18.)

Adams also contends that the government "did not present any evidence" as to the substantive structuring counts against him.  (*Id.* at 13.)  He asserts that there was no evidence that he had authorized the checks listed in the counts against him, in light of the fact that they had been signed by his signature stamp.  (*Id.* at 14.) He contends that the court erred in limiting the testimony of his forensic

accountant, who could have testified that the checks that Adams allegedly had written to the cash providers were less than the total amount of cash that the government alleged he had received. (*Id.* at 19.)  Finally, he argues that the government presented its case through leading questions, which prejudiced him. (*Id.* at 22.)

John Ward has filed a Motion for Judgment of Acquittal, or, in the Alternative, New Trial. (ECF No. 433.)  Ward argues that the government's evidence showed the existence of multiple conspiracies, not a single conspiracy. (Br. Supp. 4, ECF No. 434.)  He contends that the government did not prove his participation in the conspiracy because no evidence was presented that his company — Warcreek Mining — had filed erroneous tax returns, or that he had attempted to hide his handwritten markings on the books denoting cash payments to be made to his employees. (*Id.* at 5.)  He also argues that there was no evidence that he had known about false invoices in his company's records, because his bookkeepers acted independently without his input or direction. (*Id.* at 11.)  With regard to his role at W.A. Mining, Adams' company, Ward asserts that the evidence at best showed that he had picked up some of the cash, which he claims did not of itself indicate that he had been aware of the false invoices being supplied to W.A. Mining. (*Id.* at 5.)

With regard to the structuring counts, Ward argues that the government did not present evidence that he had known that J.D. McReynolds was structuring cash withdrawals, or that he had been aware of the currency transactions reporting requirement. (*Id.* at 10, 13.)  He contends that his father had been responsible for any checks written to the McReynolds by Warcreek Mining. (*Id.* at 14.)  Finally, he argues that the jury's acquittal of David Cline on structuring counts in which he was also charged shows that the jury could not have found structuring by the McReynolds family in those transactions. (*Id.* at 15.)

The motions have been fully briefed and are ripe for decision.[1]  After careful consideration of the record and the arguments made by counsel, I will deny the motions.

## II.

A summary of the evidence presented as to each defendant is as follows.

### William "Bill" F. Adams, Jr.

Law enforcement officials executed a search warrant at Sandy's Bookkeeping, the bookkeeping firm used by Adams, on November 8, 2011, and seized the financial records for Adams' company, W.A. Mining, which had two coal mines: the Cherokee mine and the Warcreek mine.  At trial, the government

---

[1] I will dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not significantly aid the decisional process.

introduced time sheets from W.A. Mining that contained handwritten notations. (Trial Tr. 82, Jan. 24, 2014, ECF No. 411.)  Angela "Angie" Payne, an employee of Sandy's Bookkeeping, testified that Adams had made the handwritten notations to show which employees should be paid in cash and how much they should receive. (*Id.* at 15.)  She identified these handwritten notations on time sheets from both mines.  (*Id.* at 14, 26-27.)  She testified that she had not paid employment taxes for the company on the cash wages, and that she had not reported them on W-2 forms.  (*Id.* at 15, 27.)

Payne also testified that she had handled bookkeeping for R.S. Mining and Illusions, Inc., two companies that Adams started after W.A. Mining stopped operating the Warcreek mine.  (*Id.* at 30-31.)  Payne testified that Adams had paid employees in unreported cash at R.S. Mining as well, although R.S. Mining's records were not originally seized from her office when the search warrant was executed.  (*Id.* at 31.)  She testified that someone had removed the timesheets for R.S. Mining after the search, and that Adams had brought them back to her.  (*Id.* at 31-32.)  She said that the returned time sheets had been altered because they no longer showed unreported cash payments.  (*Id.* at 32.)

Sandra "Sandy" Addair, the owner of Sandy's Bookkeeping, also testified to her knowledge of Adams' involvement in the check cashing scheme.  She testified that J.D. and C.E. McReynolds had dropped off invoices for Adams at her office.

(Trial Tr. 148, Jan. 29, 2014, ECF No. 414.)  She stated that she had written checks for these invoices using signature stamps, but only with Adams' or Ward's permission — they would either tell her to pay an invoice, or she would call them to see if she should pay it.  (*Id.* at 149.)  She also testified that she had seen Adams pick up the returned cash from her office, even though defendant Ward usually picked up the cash.  (*Id.* at 161.)

Addair identified a time sheet for W.A. Mining and explained that the notations on it were the amounts Adams had told her to pay in unreported cash.  (*Id.* at 153.)  She testified that she had not included the cash payments on W-2s or in the employment tax calculations.  (*Id.* at 158.)  Addair testified that she had filed falsified income tax returns, Form 941 (employment tax) returns, and W-2s for Illusions, Inc., R.S. Mining, and W.A. Mining.  She also testified that she had filed falsified individual tax returns for Adams.  (*Id.* at 166-70.)

Addair testified that she had gone to the mines while her office was being searched to tell Adams what was happening.  (*Id.* at 162-63.)  She testified that he had said in reference to the time sheets with the handwritten notations, "I thought you destroyed those."  (*Id.* at 163.)

The government also introduced extensive paper evidence on the structuring counts against Adams.  It introduced the general ledgers of W.A. Mining, R.S. Mining, and Illusions, Inc.  (Trial Tr. 61, Jan. 24, 2014, ECF No. 411.)   It

presented invoices from JD&C Mining Inc., L&A Trucking, and E&J Mine Supply Inc. to W.A. Mining, and also introduced records of the checks written to pay those invoices. (*Id.* at 42-58.) Payne testified that Adams had authorized her to write these checks, and that members of the McReynolds family had dropped off cash at her office during this period. (*Id.* at 47-53.)

The government introduced evidence that Payne had written Adams more than two dozen checks as reimbursement for false business expenses. (Trial Tr. 67-72, 77, Jan. 24, 2014, ECF No. 411.) Payne identified these checks on W.A. Mining's ledger. (*Id.*) She testified that while Adams occasionally had brought in receipts for mine expenses, the receipts did not add up to the total amount of checks he had received as reimbursement. She stated that the checks actually had been for cash, not repairs. (*Id.* at 80-81.) Sandy Addair also testified that she had written reimbursement checks to Adams that he actually had used for payroll cash. (Trial Tr. 158-159, Jan. 29, 2014, ECF No. 414.)

The government presented evidence on Adams' structured transactions with Kermit Wiley as well. Wiley testified that he had sold cash to Adams for a ten percent fee by having checks made out to Dare McKinney, a disabled coal miner to whom Wiley would sometimes give part of the money. (Trial Tr. 206-07, Jan. 27, 2014, ECF No. 422.) Wiley testified that he had sold cash to Adams several times, and that the invoices that he had given to Adams stating that the money was for

services were false. (*Id.* at 209.) The government introduced invoices from Dare McKinney to R.S. Mining, and also introduced records of the checks used to pay those invoices. (Trial Tr. 73-76, Jan. 24, 2014, ECF No. 411.) Payne testified that Adams had asked her to write checks made out to McKinney that Wiley had received. (*Id.* at 73-74.)

The government called three cooperating co-conspirators who testified that they had also participated in the scheme by purchasing cash for phoney business expenses.

First, Henry Barnett, a mine operator, testified that he had participated in check cashing with Eddie, J.D. and C.E. McReynolds, and Kermit Wiley. He stated that he had written checks purported to be for mine supplies, and that they had given him cash in exchange for a ten percent fee. (Trial Tr. 111, 117-18, 142, Jan. 23, 2014, ECF No. 410.) He testified that he had used the cash to pay his workers or himself in order to avoid paying federal taxes and triggering currency reporting requirements. (*Id.* at 115, 124-25.) Barnett said that he had met with fellow coal mine operators Adams, Ward, Payne, Addair, and Truong "Hoppy" Nguyen after Sandy's Bookkeeping had been searched to discuss being subpoenaed to appear in front of a grand jury. (*Id.* at 130-32.) He testified, "We talked about if everybody stayed together they didn't have any evidence and we'd be all right." (*Id.* at 131.) Barnett also testified that he had attended a separate

meeting with Adams, Ward, David Raber, Hung "Sang" Nguyen, and Hoppy Nguyen after Raber had announced that he was going to take a plea. (*Id.* at 138.) Barnett testified that Adams had said he did not want anyone to take a plea. (*Id.* at 139.)

David Raber, another mine operator, testified that he had obtained cash from Wiley and the McReynolds family for a ten percent fee by writing checks for false invoices. (Trial Tr. 31-33, 45, Jan. 27, 2014, ECF No. 422.) He testified that he had known about the over-$10,000 reporting requirement, and that he had known J.D. McReynolds was doing something to get around the reports. (*Id.* at 44.) Raber testified that he had met with Ward, Adams, Barnett, Hoppy Nguyen and Sang Nguyen the night before he had signed his plea agreement. (*Id.* at 38-39.) He testified that Adams had said that the government's proposed plea agreement was "no good" and had told them that his lawyer had said that "it wasn't worthwhile to wipe his butt on" and "they ain't got no evidence on us." (*Id.* at 39.) He testified that they had discussed how if they all stuck together they might win, but that if one of them admitted to taking cash from J.D. McReynolds, it would show that they all did it. (*Id.* at 43.) He stated that Adams and Ward had said that the government did not have any evidence unless someone pleaded guilty. (*Id.*)

Finally, Sang Nguyen, a mine operator, testified that he had purchased cash from the McReynolds family and Wiley. (Trial Tr. 8, 11, Jan. 28, 2014, ECF No.

413.)  He also testified that he had met with Ward, Adams, Barnett, Raber, and Hoppy Nguyen after the search of Sandy's Bookkeeping.  (*Id.* at 18.)  He said that the talk occurred at his mines, and that during the talk, Adams had said that the plea agreement was not good.  Nguyen stated that they had discussed whether to wait for a better plea or whether to claim that all the invoices were legitimate.  (*Id.* at 18-19.)  He testified that everybody had tried to talk Raber out of pleading guilty.  (*Id.* at 24.)

Adams presented testimony from five witnesses in his defense.  Willard Lane, an employee of cash provider Kermit Wiley, testified that Wiley's company, United Hydraulics, Inc., had provided legitimate services to Adams' companies, W.A. Mining and R.S. Mining.  (Trial Tr. 36, Jan. 31, 2014, ECF No. 418.)  Dare McKinney, a disabled coal miner whose name was used when people wrote checks to Kermit Wiley, testified that he had given old coal mining equipment to Wiley to sell.  He stated that he had given Wiley a power of attorney and that he had known Wiley was getting cash for some of the checks.  (*Id.* at 48, 50.)  He testified that Wiley had given him money from time to time.  (*Id.* at 46.)  Next, Fred Stinson, an employee of R.S. Mining, testified that Wiley's company had done the majority of R.S. Mining's hydraulic work, and that Wiley had frequently dropped off parts at the mine. (*Id.* at 59-60.)  He testified that based on R.S. Mining's size, it would not be unusual to spend a quarter of a million dollars on hydraulic work in a year.  (*Id.*

at 60.)  Stinson also admitted on cross-examination that he sometimes had been paid in cash.  (*Id.* at 65.)

Adams also introduced testimony from two accountants.  Robert Toler had taken over Adams' work from Sandy's Bookkeeping.  (*Id.* at 74.)  He testified that Sandy Addair had warned him that the records weren't in good shape.  (*Id.* at 82.)  He stated that he had performed an audit trail on the records of R.S. Mining and Illusions, Inc. that showed that on March 17, 2012, payments that originally had been classified as operating expenses were reclassified to indicate that an accountant needed to be consulted.  (*Id.* at 87-89.)

Next, Robert Rufus, a forensic accountant, testified that he thought the services provided by Sandy's Bookkeeping "fell far from any standard."  (*Id.* at 148.)  He testified that taxes on cash wages are not difficult to withhold, and stated that it is no excuse for a tax preparer to say that a client directed the preparer to handle the books in a way that violated the regulations governing tax preparers.  (*Id.* at 147-48.)

### *John B. Ward.*

Law enforcement officers seized financial records for Ward's company, Warcreek Mining, from Sandy's Bookkeeping.  They also seized records for W.A. Mining during the time it was operating the Warcreek mine.  Ward worked with Adams at W.A. Mining during this time.

Among the records seized and introduced at trial were time sheets from Warcreek Mining and W.A. Mining with handwritten notations. (Trial Tr. 82, Jan. 24, 2014, ECF No. 411.) The government also introduced invoices from E&J Mine Supply Inc., JD&C Mine Supply Inc., and L&A Trucking to Warcreek Mining or W.A. Mining (*Id.* at 42-58), and the general ledgers of W.A. Mining and Warcreek Mining. (*Id.* at 61.)

In addition to these documents, the government presented testimony from bookkeepers Payne and Addair about Ward's involvement in the check cashing scheme and the status of Ward's books.

Payne testified that she had spoken to Ward on November 8, 2011, the day that her office had been searched. (Trial Tr. 22-23, Jan. 24, 2014, ECF No. 411.) She stated that Ward had met her near her office and she had told him that the records were being seized. (*Id.* at 23.)

Payne also testified about Ward's financial records. She stated that Ward had told her that certain employees should be paid in cash. She stated that he had not told her to pay employment taxes or file W-2s that took into account cash wages. (*Id.* at 18-19, 22.) She identified handwritten marks denoting cash wages on time sheets from Warcreek Mining, and on time sheets from W.A. Mining when Ward and Adams were working together. (*Id.* at 18, 28-29.) Payne testified that

Ward had also worked at R.S. Mining, Adams' company, that was also paying employees in cash. (*Id.* at 31.)

Payne testified that when J.D. McReynolds had cash for Warcreek Mining, Ward or his brother Robbie would call her and tell her that McReynolds was coming by and that she should write him a check. (*Id.* at 25.) Payne testified that when Ward and Adams were working together, J.D. McReynolds would call her and ask her if they needed anything. She said, "I would call Bill [Adams] or John [Ward], and usually if Bill answered the phone he'd say 'Hang on, I'll let you talk to John.'" (*Id.* at 35-36.) She said they would tell her how much cash they needed, McReynolds would drop it off, and Ward would pick it up. (*Id.* at 34, 36-37.)

Addair also testified to Ward's involvement in the check cashing scheme. She testified that she had been the bookkeeper for Warcreek Mining. (Trial Tr. 149, Jan. 29, 2014, ECF No. 414.) She testified that the McReynolds family had brought invoices for Ward to her office, and that she had written checks for the invoices using Ward's signature stamp with Ward's permission. (*Id.*) She stated that she had learned Ward was receiving cash after she had seen the currency through a plastic Wal-Mart bag that J.D. McReynolds had dropped off for Ward. (*Id.* at 150.) She testified that generally Ward would pick up the cash that J.D. and C.E. McReynolds brought to her office. (*Id.* at 161.)

Addair identified handwritten notations on a time sheet from Warcreek Mining, and testified that Ward had told her to pay these people in cash. (*Id.* at 157.) She testified that she had not included cash wages in W-2s or employment tax calculations. (*Id.* at 158.) She also testified that she had written reimbursement checks to Ward that were actually used for payroll cash. (*Id.* at 158-159.) Addair testified that she had filed falsified income and employment tax returns and W-2s for Warcreek Mining and W.A. Mining, and that she had filed falsified individual tax returns for Ward. (*Id.* at 166-70.)

The government also presented testimony from J.D. McReynolds, whose companies include E&J Mine Supply Inc., JD&C Mine Supply Inc., and L&A Trucking, about his involvement in the check cashing scheme and his interactions with Ward. (Trial Tr. 15, Jan. 30, 2014, ECF No. 415.) McReynolds testified that he had sold cash for a ten percent fee by cashing checks for false invoices for mining equipment from his companies. (*Id.* at 17.) He testified that he had sold cash to many individuals, including Henry Barnett, Hoppy Nguyen, David Raber, Sang Nguyen, Billy Ray Dotson, David Cordill, Mike Poskas, Jeff Justus, Clinton Ramey, Darrell Felts, Rosie Ritchie, John Ward, Melvin Parsley, Allen Workman, and David Cline. (*Id.* at 19-21, 24, 73-74.) He stated that he had used checks for amounts not over $10,000 to keep his activity from being reported. (*Id.* at 28.) He testified that he had falsified invoices for Warcreek Mining, and he identified

-18-

specific checks and invoices reflecting that they were for equipment that were actually for cash. (*Id.* at 32-33, 34, 38, 41, 46, 49, 52.) McReynolds testified that he had done cash deals with Ward at W.A. Mining as well. He said that he had taken cash to Warcreek Mining, W.A. Mining, and Sandy's Bookkeeping. (*Id.* at 72.)

C.E. McReynolds also testified to his involvement in the check cashing scheme and his interactions with Ward. He testified that people had purchased cash from his family's companies for a ten percent fee. (Trial Tr. 35, 52, Jan. 29, 2014, ECF No. 414.) He testified that he would deliver the cash by himself or with J.D. McReynolds to deliver the cash. (*Id.* at 36.) He stated that he had delivered cash to Ward, usually at Sandy's Bookkeeping. (*Id.* at 36, 40, 58.) He also identified several false invoices that his family's companies had issued to Warcreek Mining and W.A. Mining. He stated that the invoices had been falsified to mask cash deals. (*Id.* at 49-54, 57-58.) He testified that when he had done cash deals with W.A. Mining or Warcreek Mining, he had dealt with Ward. (*Id.* at 58.)

The government also presented evidence of Ward's knowledge of others who were participating in the check cashing scheme. As discussed above, Henry Barnett, David Raber, and Sang Nguyen all testified that Ward had attended the meeting that was held after Raber had indicated that he intended to sign a plea agreement. (*See* Trial Tr. 130-32, 138-39, Jan. 23, 2014, ECF No. 410 (Barnett's

testimony); Trial Tr. 31-32, 43, Jan. 27, 2014, ECF No. 422 (Raber's testimony);

Trial Tr. 18, Jan. 28, 2014, ECF No. 413 (Sang Nguyen's testimony).)

Barnett testified that Ward had attended the meeting held after Raber

indicated that he intended to take a plea, and another meeting where Ward, Adams,

Payne, Addair, and Hoppy Nguyen had talked about being subpoenaed to appear in

front of a grand jury. (Trial Tr. 130-32, 138-39, Jan. 23, 2014, ECF No. 410.)

Raber testified that at the meeting discussing plea agreements and his

intention to take a plea, Ward and Adams had said that the government did not

have any evidence unless someone pleaded guilty. (Trial Tr. 43, Jan. 27, 2014,

ECF No. 422.) Raber also testified that on or about November 8, 2011, the day of

the search, he had spoken with Ward and Sang Nguyen. (*Id.* at 35.) He testified

that Nguyen had told Ward that Ward should not have put the bookkeepers, Addair

and Payne, in the position that he did by bringing cash to their office. (*Id.* at 36-

37.) Raber testified that he had spoken to Ward about how they did not know that

J.D. McReynolds had been conducting the check cashing scheme with so many

people. (*Id.* at 37.)

Finally, Sang Nguyen testified about Ward's presence at the meeting

discussing Raber's intention to plea. He also testified that he had talked to Ward

about the cash that Ward was having delivered to Sandy's Bookkeeping. He said

that he had told Ward that Addair and Payne should not have been involved in the cash scheme.  (Trial Tr. 19-20, Jan. 28, 2014, ECF No. 413.)

### III.

Both defendants argue that the evidence presented at trial was insufficient to support their participation in the single, large-scale conspiracy alleged.  They contend that at best the evidence showed multiple conspiracies — different and unrelated check cashing conspiracies run by different cash providers.

The defendants' argument challenges the sufficiency of the evidence supporting the jury's verdict that each defendant was a member of the same conspiracy.  *See United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir. 1991). A variance occurs when "the evidence at trial establishes facts materially different from those alleged in the indictment." *United States v. Kennedy*, 32 F.3d 876, 883 (4th Cir. 1994).  "A defendant may establish that a material variance occurred by showing that the indictment alleged a single conspiracy but that the government's proof at trial established the existence of multiple, separate conspiracies." *United States v. Bollin*, 264 F.3d 391, 405 (4th Cir. 2001) (internal quotation marks and citation omitted).  The jury must determine whether the evidence shows a single conspiracy or multiple conspiracies.  *Id.*  "If the jury is properly instructed, the finding of a single conspiracy must stand unless the evidence, taken in the light

most favorable to the government, would not allow a reasonable jury so to find."

*United States v. Urbanik*, 801 F.2d 692, 695 (4th Cir. 1986).

In this case, the defendants received a multiple-conspiracy jury instruction to support a defense that they were at most members of separate and uncharged conspiracies. As part of the final jury charge, the court instructed the jury as follows:

> Count One of the indictment charges that the defendants were members of a single conspiracy.

> To convict any one of the defendants of the conspiracy charge, the government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment. If the government fails to prove this, then you must find that defendant not guilty of the conspiracy charge, even if you find that he was a member of some other conspiracy. Proof that a defendant was a member of some other conspiracy is not enough to convict.

> But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict, if the government also proved that he was a member of the conspiracy charged in the indictment.

> Whether the evidence proves a single conspiracy or two or more multiple conspiracies is a question of fact which you must decide.

> Multiple conspiracies involve separate agreements operating independently of each other.

> In order for you to find a single conspiracy, there should be some overlap of key actors, methods, goals, or objectives. In other words, there should be enough evidence for you to conclude, beyond a reasonable doubt, that there was one overall agreement or one general business venture.

On the other hand, as I have instructed, it is not necessary for the government to prove that a defendant knew all of his co-conspirators, or that he was aware of all of the details of the criminal activity, for you to conclude that there was a single conspiracy. I further instruct you that it is possible for members of a single conspiracy to work together in parallel positions, or even to compete against one another, without becoming a separate or additional conspiracy.

In summary, you should consider all relevant evidence — including any evidence of common actors, goals, objectives, time periods, places, or territories — and decide whether it proves a single conspiracy, multiple conspiracies, or no conspiracy at all.

(Final Jury Instructions 23-24, ECF No. 377.)

The jury found Ward and Adams both guilty of the conspiracy charge. As the instruction above shows, the jury was aware that it could find the existence of multiple, separate conspiracies instead of one overarching conspiracy.

Indeed, there are several grounds upon which a jury can find a single conspiracy. A single conspiracy exists where there is '"one overall agreement."' *United States v. Leavis*, 853 F.2d 215, 218 (4th Cir. 1988) (quoting *United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir. 1982)). "Whether there is a single conspiracy or multiple conspiracies depends upon the overlap of key actors, methods, and goals." *Leavis*, 853 F.2d at 218. In contrast, in a multiple conspiracy scenario, each individual's agreement is "distinct and disconnected, not part[] of a larger general scheme." *Blumenthal v. United States*, 332 U.S. 539, 558 (1947). "Where the conspiracies lack a substantial overlap in time, participants, facts, or aims,

multiple conspiracies should be found." *United States v. Leonard*, 777 F. Supp. 2d 1025, 1034 (W.D. Va. 2011).

The same criminal conduct in the same geographic region can support the existence of a single conspiracy. *See, e.g.*, *United States v. Banks*, 10 F.3d 1044, 1054 (4th Cir. 1993) (defining the conspiracy as satisfying the "massive consumer market for heroin and cocaine in the general Tidewater area of Virginia"). A defendant's participation in a single conspiracy may also be inferred by "regularity and volume of dealings," even if the defendant lacks "specific knowledge of the existence or numbers of" other members of the conspiracy. *United States v. Burman*, 584 F.2d 1354, 1356-57 (4th Cir. 1978).

Furthermore, the government was not required to establish relationships between each defendant and each cash provider in order to prove a single conspiracy. "[O]ne may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence." *Banks*, 10 F.3d at 1054. This is akin to a conspiracy to distribute multiple types of drugs; in such a conspiracy, the government is not required to link each defendant to each drug. *Id.* at 1054-55 (holding that evidence showing that a defendant was involved in heroin transactions was sufficient to prove participation in a single large-scale drug conspiracy to distribute multiple types of drugs).

Multiple conspiracies are not established merely because a single conspiracy has multiple goals. *See Bollin*, 264 F.3d at 405 ("Although the conspiracy had multiple objects — wire fraud, securities fraud, and obstruction — the objects clearly were related to the overall goal of defrauding investors through fraudulent offshore debentures trading programs.").

Finally, circumstantial evidence is sufficient to convict a defendant of participation in a conspiracy. *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" *Id.* at 858 (quoting *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984)). "[T]he evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." *United States v. Brooks*, 957 F.2d 1138, 1147 (4th Cir. 1992).

In order to convict the defendants of a tax fraud or structuring conspiracy in violation of 18 U.S.C. § 371, the government must show: "'(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the [agreement's] objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States.'" *United States v. Vogt*, 910 F.2d 1184, 1202 (4th Cir. 1990) (quoting *United States v. Shoup*, 608 F.2d 950, 956 (3d Cir.

1979)).  "The offense comprehends 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.'" *Vogt,* 910 F.2d at 1202 (quoting *Shoup*, 608 F.2d at 964).

Contrary to Adams' assertions, it was not necessary for the government to demonstrate both types of illegal, conspiratorial conduct alleged in the indictment. "'[T]he indictment establishes the outer limits of the scope of the conspiracy . . . . In other words, the indictment establishes a ceiling not a floor.'"  *Leonard,* 777 F. Supp. 2d at 1031 (quoting *United States v. Kang*, 715 F.Supp.2d 657, 673 (D.S.C. 2010)).  "As a general rule, when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, the verdict stands if the evidence is sufficient with respect to any one of the acts charged."  *Leonard,* 777 F. Supp. 2d at 1032 (citing *United States v. Hawkes*, 753 F.2d 355, 357 (4th Cir. 1985)).

In assessing the sufficiency of the evidence, the court must determine whether there is substantial evidence to support the conviction when viewed in the light most favorable to the government.  *United States v. Strayhorn*, 743 F.3d 917, 921 (4th Cir.), *cert. denied*, 134 S. Ct. 2689 (2014).  "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt."  *United States v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011) (internal quotation marks and citation omitted).  The test is whether "any rational trier of fact could have found

the essential elements of the crime beyond a reasonable doubt." *United States v. Madrigal-Valadez*, 561 F.3d 370, 374 (4th Cir. 2009) (internal quotation marks and citation omitted).

The court must consider "the complete picture" created by the evidence, *Burgos*, 94 F.3d at 863, including both circumstantial and direct evidence, and draw all reasonable inferences from such evidence in the government's favor. *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008). If the evidence supports difference interpretations, the jury decides which interpretation to believe, and I "may not overturn a substantially supported verdict merely because [I] find[] the verdict unpalatable or determine[] that another, reasonable verdict would be preferable." *Burgos*, 94 F.3d at 862. Rather, "[a] defendant bringing a sufficiency challenge must overcome a heavy burden, and reversal for insufficiency must be confined to cases where the prosecution's failure is clear." *United States v. Engle*, 676 F.3d 405, 419 (4th Cir.) (internal quotation marks and citations omitted), *cert. denied*, 133 S. Ct. 179 (2012).

Accepting the evidence presented at trial in the light most favorable to the government, the jury reasonably could have found that Adams participated in the single conspiracy charged. He had close relationships with two professed participants in the conspiracy, Angie Payne and Sandra Addair. He also had a close working relationship with John Ward, and numerous witnesses testified that

Ward frequently had picked up illegally purchased cash.  The invoices from the cash providers to Adams' companies, the time period in which those invoices were issued, and the testimony regarding Adams' payment of under-the-table cash wages to his workers all support Adams' conspiracy conviction.  Based on the evidence, the jury reasonably could infer that Adams had knowledge that the cash providers were engaging in cash structuring, even though the cash providers J.D. and C.E. McReynolds testified to limited direct involvement with Adams.

Similarly, the evidence at trial showed that Ward had close relationships with many key participants in the conspiracy, including J.D. McReynolds, C.E. McReynolds, Sandy Addair, and Angie Payne.  Ward also had a close relationship with his co-defendant Adams.  The government presented evidence that Ward had picked up cash from Sandy's Bookkeeping, had authorized Addair and Payne to pay invoices from cash providers, and had indicated which employees should be paid cash wages.  Accordingly, the jury reasonably could have found that the government proved beyond a reasonable doubt that Ward was guilty.

In summary, the jury was properly instructed that it could find the existence of multiple conspiracies, and government's evidence was sufficient to support the existence of a single conspiracy.  The arguments made by Adams and Ward are insufficient grounds for setting aside the conspiracy convictions.

IV.

The defendants both argue that the government did not present sufficient evidence to convict them of the substantive structuring counts.

To prove an offense under 31 U.S.C. § 5324(a)(3), the government must establish that "(1) the defendant knowingly engaged in structuring; (2) the defendant knew of the reporting requirements under federal law; and (3) the purpose of the transaction was to evade the requirements." *United States v. Abdelbary*, 496 F. App'x 273, 276 (4th Cir. 2012) (unpublished).

Under 18 U.S.C. § 2, "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal," and "[w]hoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." Thus, even if the defendants did not make the structured withdrawals of cash themselves, their procurement of the cash providers to do so for them makes them equally as culpable.

Viewing the evidence in the light most favorable to the government, I find that sufficient evidence was offered at trial from which a reasonable juror could have found that Adams and Ward were guilty of structuring. *See United States v. Iskander*, 407 F.3d 232, 236 (4th Cir. 2005). First, there was evidence that both Adams' and Ward's companies issued checks to the cash providers in sums that

matched or corresponded to the amounts that the cash providers made in structured withdrawals, as listed in each structuring count in the Third Superseding Indictment.  Second, there was evidence that other members of the conspiracy knew of the reporting requirements under federal law.  Two cooperating witnesses with whom Adams and Ward had discussed the check cashing scheme had been aware of the reporting requirements.  Barnett testified that he had purchased cash in order to avoid paying taxes and triggering bank reporting requirements.  (Trial Tr. 124-25, Jan. 23, 2014, ECF No. 410.)  Raber testified that he had known about the reporting requirements, and that J.D. McReynolds was doing something to get around them.  (Trial Tr. 44, Jan. 27, 2014, ECF No. 422.)

Additionally, the defendants' efforts to hide the manner in which they obtained cash suggest that they knew their conduct was illegal.  *See Abdelbary*, 496 F. App'x at 277 ("This attempt to hide illegal activity is itself evidence that Abdelbary knew his conduct was illegal."); *United States v. Beidler*, 110 F.3d 1064, 1069 (4th Cir. 1997) (discussing how "willfulness may be inferred from evidence of attempts to conceal illegal conduct").

The third element of § 5324(a)(3), proof that the purpose of the transaction was to evade the reporting requirements, also can be established through evidence that the defendants attempted to hide their illegal conduct.  *Abdelbary*, 496 F. App'x at 277.  The defendants could have withdrawn cash in amounts of more than

$10,000 from financial institutions where they had accounts, but instead chose to go through the cash providers.

Ward argues that he is not sophisticated in financial matters and that he had relied on his bookkeeper. These arguments are without merit. *See Abdelbary*, 496 F. App'x at 277 ("That Abdelbary may not have been as sophisticated a businessman or developed as complex a scheme to avoid the reporting requirement . . . does not mean that Abdelbary was not engaged in illegal structuring.").

Moreover, the jury could have convicted the defendants based solely on the substantive structuring offenses committed by their co-conspirators in the course of and in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 645 (1946). Under the *Pinkerton* doctrine, liability for substantive offenses committed by co-conspirators attaches when "'their commission is reasonably foreseeable and in furtherance of the conspiracy.'" *United States v. Dinkins*, 691 F.3d 358, 384 (4th Cir. 2012) (quoting *United States v. Ashley*, 606 F.3d 135, 142-43 (4th Cir. 2010)). This rule of law "reflects the fact that the combination of criminal capacities often poses a greater risk to society than the actions of a single offender." *United States v. Blackman*, 746 F.3d 137, 141 (4th Cir. 2014). "[W]hen one reaps the benefits of a collective criminal enterprise, one should be prepared to accept collective consequences." *Id.*

The jury was aware that it could convict defendants Adams and Ward of the structuring counts against them based solely on the actions of their co-conspirators. As part of the final jury charge, the court instructed the jury as follows:

> The law permits a conspirator to be convicted of substantive offenses committed by co-conspirators in the course of and in furtherance of the conspiracy.

> If you find that the government has proven a defendant guilty of conspiracy as charged in Count One of the indictment, you may also find him guilty of the substantive crimes alleged in any other counts of the indictment in which he is charged, provided that the government has proven these elements beyond a reasonable doubt:

> 1) That the substantive criminal offense was committed by one of the members of the conspiracy;

> 2) That the substantive offense was committed while the co-conspirator was a member of the conspiracy; and

> 3) That the offense was committed in furtherance of the conspiracy; and

> 4) That the offense was reasonably foreseeable as a necessary or natural consequence of the conspiracy. In order to be reasonably foreseeable to another member of the conspiracy, acts of a co-conspirator must fall within the scope of the agreement between the specific individual and the co-conspirator.

> You may find a defendant guilty of a criminal offense committed by a co-conspirator if and only if each of these elements is proven beyond a reasonable doubt.

(Final Jury Instructions 25-26, ECF No. 377.)

The government's evidence was sufficient to support the structuring convictions of defendants Adams and Wards under *Pinkerton*. Cooperating witnesses who pleaded guilty to participation in the conspiracy testified that they had structured cash out of financial institutions in order to avoid reporting requirements, and that they sold this structured cash to defendants Adams and Ward. Whether the defendants made the actual withdrawals that structured cash out of financial institutions is irrelevant: "'[A] defendant need not be involved in every phase of [a] conspiracy to be deemed a participant." *Blackman*, 746 F.3d at 141 (quoting *Leavis*, 853 F.2d at 218). The evidence is sufficient that Adams and Ward used the structured cash in order to further a conspiracy to defraud the United States and avoid taxes. The possibility that cash providers might have structured the cash that they were selling to the defendants was reasonably foreseeable. As members of the conspiracy, the defendants are legally responsible for the structured withdrawals of cash that occurred.

In sum, there is sufficient evidence to support the structuring counts.

## V.

Adams argues that the government used leading questions to present its case, and that this resulted in clear and prejudicial error. "Rule 611(c) provides trial judges with broad latitude in monitoring the manner in which testimony is extracted from witnesses." *Winant v. Bostic*, 5 F.3d 767, 773 (4th Cir. 1993).

"[T]he extent to which the use of leading questions may be indulged or limited is a matter primarily for the discretion of the trial judge." *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963). During the government's case in chief, Adams' counsel made numerous objections to leading questions, some of which were sustained, and some of which were overruled. (*See, e.g.*, Trial Tr. 82, 117, 133, 138, Jan. 23, 2014, ECF No. 410.) Leading questions can be prejudicial when they supply "a false memory for the witness." *Durham*, 319 F.2d at 592. A defendant might have been prejudiced if "false answers were supplied by these questions," but there is no assertion or factual indication that such is the case here. *Id.* at 594. To the extent that the court erred in any of these evidentiary rulings, a possibility that exists in any trial, it did not affect the outcome.

## VI.

Adams argues that the court erred in excluding a chart prepared by his expert witness Robert Rufus, a forensic accountant. (Mem. Supp. 19, ECF No. 432.) The chart contained information on the financial transactions of Kermit Wiley, one of the cash providers. After the government objected, the offered exhibit was refused. (Refused Ex. 16, ECF No. 406, *discussed at* Trial Tr. 111-140, Jan. 31, 2014, ECF No. 418.)

Adams argues that the chart was an appropriate summary exhibit that the court should not have excluded. Adams asserts that Rufus would have used the

chart to testify that the checks cashed by Kermit Wiley were insufficient to provide the amount of cash that the government contended that Adams received from Wiley. He claims that the court also erred in excluding the testimony that Rufus would have given about the chart.

The chart and the evidence that Rufus would have given about the chart were properly excluded. Federal Rule of Evidence 1006 provides that "a summary, chart, or calculation [is admissible] to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." However, the rule is not a backdoor for inadmissible evidence — "the records summarized must otherwise be admissible." *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). "[A] contrary rule 'would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay.'" *United States v. Ging-Hwang Tsoa*, 1:13cr137 (JCC), 2013 WL 6145664, at * 6 (E.D. Va. Nov. 20, 2013) (quoting *United States v. Irvin*, 682 F.3d 1254, 1262 (10th Cir. 2012)).

The chart proposed by Adams relied on the contents of a memorandum prepared by a government agent after interviewing Kermit Wiley in 2012. Adams sought to use the chart to introduce portions of the agent's report reciting statements that Wiley had made to the agent. Hearsay is a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a

party offers in evidence to prove the truth of the matter asserted in the statement."

Fed. R. Evid. 801(c).  The agent's report was hearsay, and did not fall under any

exception to the hearsay rule.  Therefore, the portions of the report that Adams

sought to introduce in the chart are not admissible.

It is irrelevant that Adams sought to introduce the chart through an expert.

While an expert may appropriately provide an opinion within his or her area of

expertise, an expert cannot be used solely to introduce evidence that is otherwise

inadmissible.  Federal Rule of Evidence 703 states:

> If experts in the particular field would reasonably rely on . . . facts or
> data in forming an opinion on the subject, they need not be admissible
> for the *opinion* to be admitted.  But if the facts or data would
> otherwise be inadmissible, the proponent of the opinion may disclose
> them to the jury only if their probative value in helping the jury
> evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added).  Rule 703 does not allow the admission of

hearsay evidence simply because an expert is testifying.  Rather, if an expert has

relied on otherwise inadmissible evidence in forming an opinion to which he will

testify, the admission of that evidence may be allowed in some cases.  *See Blue*

*Cross & Blue Shield of S.C. v. W.R. Grace & Co.*, 781 F. Supp. 420, 427 (D.S.C.

1991) (refusing to allow the plaintiff to use an expert witness to introduce

unpublished air samples where the expert witness did not rely on those samples as

a basis for his testimony).  In the case at hand, Rufus would not have provided any

expert opinion through his testimony; he simply would have recounted inadmissible statements.

Additionally, Adams represented that he sought to have Rufus recount information in the chart in order to impeach Wiley's testimony at trial. However, the purpose of expert testimony is not to undermine witness credibility. *See United States v. Allen*, 716 F.3d 98, 105-06 (4th Cir. 2013).

The situation at hand is similar to the situation faced by the Fourth Circuit in *United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009). There, the issue was whether expert testimony on coded terms used by defendants and co-conspirators in recorded telephone calls violated the bar on testimonial hearsay set forth in *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). The court reasoned:

> The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem.

*Johnson,* 587 F.3d. at 635. The court concluded that the experts had not acted as transmitters of testimonial hearsay. It noted that the experts did not make direct reference to the content of witness interviews on which they had based their opinions, but rather, "each expert presented his independent judgment and specialized understanding to the jury." *Id*. The court noted that the experts had used their knowledge of narcotics trafficking to identify code words and odd

conversational patterns. *Id.* at 636. It contrasted the case to *United States v. Mejia*, 545 F.3d 179, 199 (2d Cir. 2008), where "the expert simply passed along an important testimonial fact he learned from a particular interview." *Johnson*, 587 F.3d at 636. In the case at hand, this is exactly what Rufus's testimony would have done. Rufus did not seek to provide an opinion in his area of expertise, but rather intended to highlight facts for the jury from an otherwise inadmissible chart.

Summary exhibits and expert opinions are two distinct forms of evidence. A litigant cannot selectively combine portions of the rules governing each in order to circumvent the core principles governing admissibility. The proponent of expert testimony has the burden of proof of admissibility. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 n.10 (1993). Adams did not meet that burden.

## VII.

I fully understand the defendants' disappointment over their convictions by the jury, particularly in light of the jury's acquittals of their codefendants in the face of equally strong evidence. Perhaps the decision of David Cline to take the stand in his own behalf and that of his son Joshua, where he proved to be a strong witness, made the difference. In any event, the fact that a jury may have rendered what may appear to some to be inconsistent verdicts is not a ground for a new trial or judgment of acquittal. *See United States v. Louthian*, 756 F.3d 295, 305-06 (4th Cir. 2014). This is true even where if the sole fellow conspirator is acquitted.

*United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990). Adams and Ward received a fair trial by their peers and the jury's verdict must be respected.

Accordingly, and for reasons set forth in this Opinion, it is **ORDERED** as follows:

1. Defendant John B. Ward's Motion for Judgment of Acquittal Or, in the Alternative, New Trial (ECF No. 433) is DENIED; and

2. Defendant William "Bill" F. Adams, Jr.'s Motion for Judgment of Acquittal (ECF No. 430) and Motion for a New Trial (ECF No. 431) are DENIED.

ENTER:   September 2, 2014

/s/  James P. Jones
United States District Judge